Good morning. May it please the Court, I'm Mark Stern for Federal Government. I think that it's common ground. I think that it's common ground that DHS was under no obligation to adopt DACA in 2012. District Court, in this case, however, concluded that DHS cannot wind down that policy until it provides what the District Court regards as an acceptable explanation. Now, the Court reached that conclusion in two principal steps. First, it mistakenly concluded that it could review an enforcement policy of unquestioned legality. And second, having made that determination, it further held that it could review the reasons that Secretary Nielsen and Secretary Jude provided under something very much like an arbitrary and capricious standard, and indeed went so far as to question the bona fide use of the Court's rule. Mr. Stern, do you agree that if all we had in front of us, and I realize we don't, this is a form of a hypothetical, if all we had in front of us was the Duke Memo, that this would be a very different case than the case we have now? It would be a different case? I don't think so. A legally significant difference. In the Duke Memo, based on the Sessions Letter, it's all about the lawfulness of DACA. Is that right or wrong? We think that's wrong. Show me in the Duke Memo whether there's something stated other than the reason given for the decision, other than the view that DACA was unlawful. What are the words that say that? I should be able to put my finger on this. The most relevant part would be J.A. 363, which is taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4th letter from the Attorney General. It's clear that the June 15, 2012 DACA program should be terminated in the exercise of my authority. I hereby rescind. And what the Secretary has made clear, I think, in this is that there is the question of litigation risk, which, remember, this partly gets prompted by the state of Texas. Where's that in the Duke Memo? I realize that's in the Nielsen Memo, and I'll get to that in a second. But where's that in the Duke Memo? It's not there. It's not there. It's all about the legality. Let's assume that that's true. Okay. It is true. Assuming that that's true, or I will assume that it's true, it doesn't make any difference to the way this case should have been reviewed. Because this is not a case like any, there's no case that I'm aware of in which an agency says, I'm going to enforce the law. Everyone agrees that it can enforce the law. And nevertheless, there is an attempt to review that decision. Now, if the Secretary had, in 2012, received a request to adopt a DACA policy, I don't think anybody thinks that... In my mind, there's a little question that there's authority given to the executive under these circumstances to rescind DACA. Let's just, for the sake of argument, clear that. The question is, was it done adequately here? Okay, now let's get to the Nielsen Memo. Secretary Nielsen characterizes her reasoning as such that she's not relying solely on the legality of DACA, but that there are these policy considerations. How are the policy considerations different from the legality of DACA? Because she says they're independent reasons. She suggests that quite apart from the legality of DACA, here are some policy reasons to terminate DACA. Can you help me understand what those policy reasons are and how they are independent from her judgment that DACA was unlawful? Look, on page three of the memo, Secretary Duke talks about other things, saying that if a policy like this is to be adopted, it should be by the legislature, because, among other things, any program or policy that's adopted just by the use of prosecutorial discretion is going to lack permanence and detail. Now, you can say that at some level that's related to the view of law, but if that's true, basically it says that, look, that is an independent reason. If the secretary had never said what her view of the law is and just said that, I mean, that's a view that was widely expressed without regard to whether anybody thought that the ultimate legality was in question. And I think it's very significant also to look to see what the district court said in response to that. What the district court says is that the government hadn't adequately explained why its view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion. And that's exactly the kind of question that in this context, where you're talking about enforcement discretion, and the question before the agency is, should I do this? Or is this something that should be done by the legislature before I do it? And the district court says, well, you haven't explained to me. And nothing in Cheney or any of this court's decisions suggests that the district court could have appropriately reached that conclusion. Is that your strongest argument for identifying a policy justification independent of her judgment that DACA was? Yeah, I mean, there are the other reasons, too. This is the one that speaks out at me. If the Attorney General had told her that in his judgment DACA violated the Constitution, unconstitutional separation of powers, presumably, which would be exactly this who should enact it position. And the Attorney General's decision as to questions of law like that, I think, is binding on the Secretary of Homeland Security. And if not, I think, binding under 1103. And even if not binding under 1103, it's practically binding because it says the Justice Department will not defend this program in court. So how can we know that when she talked about who should enact this, that it was independent of having been told by the Attorney General that the legal litigation position of the United States is that this violates the separation of powers? I don't think it makes any difference, Your Honor, that the Attorney General puts the view. She said she's bound by his view. How can that not affect her judgment? But look, the FDA in Hetford v. Cheney was very convinced of its view that it didn't have jurisdiction. If you look at that decision... That's not my point, though. My point is that you're arguing that that was an independent exercise of discretion by the Department of Homeland Security, separable from having been told by the Attorney General that this is unlawful, unconstitutional. And it seems to me that's exactly what the argument is about who should decide it. The Attorney General already told me whose court this ball should be in. I mean, I want to come back to what I think is a mistaken premise of equating this with decisions not to enforce the law. But just with Your Honor's point, I don't think Cheney would have been any different if the FDA had gone to OLC and received an opinion and said this is outside of your jurisdiction. But you have a statute here that tells the Department of Homeland Security the Attorney General has the last word on this. It doesn't matter, Your Honor. I mean, the point is if you think that your conviction about what the legality is means that nothing else you say matters, then I think, I mean, that essentially takes away everything that sort of is relevant to the general view that these decisions... I think it's a different question. And the question is, Secretary Nielsen says that there were independent reasons for her decision to rescind DACA apart from her view that DACA was unlawful. How can she make that assertion that there are independent reasons when the Attorney General has told her DACA is unlawful? Get rid of it. Because she can say, even if the Attorney General hadn't told me that, this is what I would do. Supposing the District Court has sent this back and said, so what is the Secretary supposed to do now? The Secretary could say, again, yes, I understand the view of the law. Yes, I'm telling you again I wouldn't do it. And the District Court is saying, that's not good enough. You haven't explained to me why this is something you should be able to do. There's nothing in any case that even remotely resembles that. And I do want to go back to the point that decisions not to enforce the law are different from decisions to enforce the law. All of the decisions, when you choose not to enforce the law, what this Court has been primarily concerned with is whether by putting in a view about the scope of a statute into the context of a enforcement decision, would an otherwise reviewable decision become non-reviewable. Your starting premise is respectfully wrong. You want to be at equity, Cheney, and I can understand why. Because then it's an unreviewable action. The problem is, the case law in this circuit has been pretty clear and consistent with Cheney. It's Crowley, it's OSG. What you start with in this case is an established policy that was enforceable, that your predecessors had put in place. And the question is how you get rid of that. And so your starting premises are wrong. You're not starting with, we win because this is not reviewable. It's a heckle of a change. It's covered by heckle of a change. That's not correct. It's covered by Crowley and that line of cases because it was an overarching policy put in place, enforceable, and now you're in the APA arena where you have to explain in an acceptable way how you're going to get rid of that policy. And when we look at this record, at least to me, when I look at this record, it is very clear that the reason the government chose to act as it did was because, as the Attorney General Sessions said, and I think everything following it, what was originally done was unlawful. And you have to justify that because it's a suspect explanation. You can't, respectfully, I'm telling you so that you can respond as you see fit, this is not a heckle of a change case. It is not. I'm giving you, we're here to have this interaction. I'm telling you, write the record and study the cases, and I know these cases well. I would put them in place in the circuit. It's the law of the circuit, and it's not inconsistent with anything the Supreme Court has said. This is a reviewable action. Your starting point is a policy that you now want to get rid of, an enforceable policy, and you have to explain it. Your Honor, I mean, I really have to say that this is, we very strongly disagree. No, but let me explain why. There really, look, all of those cases, and the concern that's expressed in Crowley and other cases is that you're going to put an otherwise reviewable decision that affects people's substantive rights, right? You're going to take that and make it unreviewable. Nobody has ever suggested that if you have a decision that is unreviewable with an exercise of prosecutorial discretion. Which one was unreviewable? The original decision, which was correct to document? Well, no, what I'm saying is that what Crowley says is Cheney turns the presumption of reviewability into a presumption the other way, which may be rebutted by showing that the substantive statute has provided guidelines for the agency to follow in exercising its enforcing powers. Now, that's the kind of thing where if you have an agency that says, I'm not going to enforce the law, and my view of the law is such that it's going to affect the primary conduct of other persons, and that's what's going on in OSG and in Crowley. There are cases about competitors saying, SHIP should not be allowed to go and compete with me under the law. And so that's what's being talked about. Or for that matter, in Brock, where the court says, of course I can't review the enforcement discretion question, to the extent that in that case there was an underlying legal question that had other consequences for records, and the record of access, the court could review that. Nobody has ever said that you can offer an advisory opinion to an agency that says, I want to enforce the law. And everybody agrees that it can enforce the law. And then to tell the agency, oh, you can't enforce the law because your predecessor had a different view of what the law was, and so you convince me that you can't do it. But it's more than that. Sorry, because I know you want to finish your answer again. Sorry. It seems to me that this is different from Heckler in an additional way, and one that is in fact implicated by your distinction of Crowley, and that is the way the immigration law is set up is that when you grant deferred action, you're not just making a prosecutorial decision to remove or not. You are changing the legal status. And I mean that in a lay sense, not an immigration law sense. You're changing their legal status. Inextricably bound up with, and referenced expressly in both the Duke and the Nielsen, and I think even the Sessions letters here, is that it's not just that we're deciding not to enforce or we're deciding to enforce. We're taking away your ability to work. Right? When you are granted deferred action, there's a lot of stuff that comes with it. It's not just a decision about prosecuting or not. It is a decision about your legal status. And so when you talk about Crowley involving the change of substantive rights or agency decisions that affect substantive rights, what you have here is not just a decision that we're going to reserve our right now or announce our right now to remove people who are in the DACA category. We are ending your ability to work. We are ending your ability to go to school. We are ending your ability to do all of the other things that you're, all the things that come with deferred action status. So it seems to me that this is not an enforcement decision in the Heckler v. Cheney sense. This is status as in granted, ability to do things. And so there's a regulatory component directly operating on individuals that is being changed. Why isn't that different? I mean, a couple points. One, there's always when you decide not to pursue a prosecution, there's always something. There are lots of results that stem from that. And you have to like end the prosecution. In the law? Well, sure. I mean, look at people operating, you know, various drug operations who do so because of the current enforcement. No, they make a choice to do it. If you had, for example, an administration said, not only are we not going to enforce marijuana laws, at least when it's just in state distribution or something like that, they draw some distinction. But, in fact, as part of our non-enforcement policy, we are going to license you to engage in interstate sales of marijuana and set up your business that way. And then if you were to come, another agency or administration comes back later and says, we think the Controlled Substance Abuse Act compels us to enforce the marijuana laws. So this prior policy was illegal. And so we're not only announcing that we're not going to enforce marijuana laws, we are revoking your licenses. And is your position that that decision to revoke licenses is just an enforcement decision? Your Honor, we're so far away from what happened here. No, exactly. We revoked their ability to work. Your Honor, nobody thinks that the Secretary, like leaving aside the enforcement discretion, right, I want to grant lots of people authority to work. What happens is the Secretary announces a enforcement policy. Now, deferred action is a long-standing concept. And going back to provisions that well-prevail any of this, one consequence is while you're in deferred action, you also have work authorization. But the Secretary couldn't say, isn't saying, and would have no power to go, I really like the idea of work authorization, so I'm giving you work authorizations. The only basis on which the Napolitano letter was ever justified on grounds of prosecutorial discretion, it says that explicitly in the Napolitano letter. If it was ever... And it says I'm authorizing the issuance of work. And then in the Duke memo, one thing it does say is it describes what DACA is. And DACA provided certain... And on page two of the memo, DACA... Here's what DACA provided. Certain illegal aliens who entered the United States before the age of 16, a period of deferred action, and eligibility to request employment authorization. Yes, but the deferred... So that's what DACA provides. No, the deferred... I mean, you know, I don't want to quibble, but the deferred action... I think it's a quibble. I think it's kind of a... Well, I mean, I think we just look... The scheme works that if I do the deferred action, that's what triggers the work authorization. What Crowley in these cases say is general statements, which is what it was. DACA was a general statement. They are more likely to be direct interpretations of the commands of the substance statute rather than the sort of mingled assessments of fact, policy, and the law that drive an individual enforcement decision. That's the starting point. That is the law. That's exactly what happened when DACA was enacted. It is exactly what Crowley in those cases is talking about. And now the... And it's reviewable. And now the question is whether you can satisfy a court when you're challenged and show that you have an adequate explanation for eliminating that policy. You can run the anti-Crowley argument all you want. My suggestion is you're wasting time because it's a weak argument. I'm sorry, Your Honor. I have to disagree. It's your time. Yeah, I get that, Your Honor. And this isn't a case in which there's a statutory command. I mean, look, there is no doubt that the secretary can enforce the law. But the only question is whether she's got to tell the district court something that the district court thinks is good enough. That's all that's going on here. The statutory command, as Bruce Lee stated, in this situation is whether or not the agency would have the authority to have a deferred action program. That's the statutory question. Indeed, that's what the attorney general and those who followed him are arguing about, whether or not under the statute you can really have what was put in place. And that's exactly what was going on when it was first done. That was the OLC memo was, is this permissible under the statute? That's what we're talking about. And from that, they came up with a general policy. To get away from that general policy now, which was a command, a legal command, you have to explain. That's not a legal command. It was a legal command. That's not a statutory command. You don't have to have a statutory command. Wait a minute. The secretary had the authority under the statute to regulate. This was a regulatory effort. That's exactly what the original program was. It was a regulatory determination that OLC reviewed and said it was permissible. Yes, it's permissible. It's not a command. What crowd leader... I don't mean command that you go to a statutory provision and it says X and you do X. It is a command in the sense the agency had the authority to do what it did. That was what they felt, and they got OLC's write-off on it. And now you're trying to come out from under that. And the question for us is what's the explanation you gave? Our sense is the explanation you gave is that what was originally done was inconsistent with the law. Your Honor, the Secretary Nielsen stated, and I think these are perfectly good reasons, and I think the district court's reasons for rejecting them are sort of the court shouldn't have been engaged in this, but once it was engaged in it, to say that the secretary couldn't say that, look, even if I could do this, even if there were no legal doubt, because that's what you said, I still think that this is the kind of program that should be enacted by Congress. Do you think Crowley allows that sort of reasoning? Is your argument that Crowley tells us that if it's a mixed question of law and policy that that's unreviewable? Yeah, I mean, that flows from Heckler. I mean, look, remember in Heckler, the agency spends most of its decision, pages of its decision talking about its lack of jurisdiction, and then in one paragraph, the only paragraph about this that's quoted in the Supreme Court, and it's the only paragraph in the decision, says, well, you know, I wouldn't do it anyway. It doesn't provide a lot of reasoning. And that Supreme Court doesn't go, gosh, like, you have this review, you know, view of the law, so I'm going to, like, A, review that, and then B, look to see whether your alternative justification, my guess is an arbitrary and capricious standard. And that's in the context where you do have to worry about an agency having to make its own decisions. What is frustrating for me about this case is, as Judge Edwards started with his questions, it's not hard to figure out how to change a policy of a prior administration. It's not difficult to do that. And the case is set forth and illustrated clearly that if it's based solely on law, that's going to be reviewable. If there are discretionary factors, if there are policy judgments, then that's a different question. And it's really, to look at the Attorney General's letter, that's all based on law. You look at the Duke memo, that's all based on law. We don't start seeing this argument until the Nielsen memo. And that's puzzling to me about why it would take so long. That only happened after a remand from Judge Bates. You didn't get the remand anywhere else. That's why you lost all those cases. But that's frustrating to me why it would take three bites at the apple before the type of reasoning that we've said for a long time needs to be apparent emerges to the fore. But then that raises the question of, is what's going on in the Nielsen memo really policy-based reasons, or is it something else, which is what Judge Millet was saying. So then what one is telling Secretary Nielsen is, look, the fact that you think that this should have been enacted by the legislature, even if you had the authority to do it, that's not good enough. Go back, come up with something else. Are we to make anything of the fact that it comes so late in the process? Doesn't that raise some suspicions about its accuracy? Let's go behind the presumption of good faith in a case like this one. I really don't think that there's any basis for doing that. And if you look at it, you go, fine. Let's assume that it was all legitimate to review this in the first place. And he goes, you didn't give me a non-legal reason, so I'm remanding it. Now you've given me a legal reason. What's your strongest case for that we ought to look at the Nielsen memo and not worry so much about its antecedents? What's your strongest case? Your Honor, it is the common state of affairs. And what the district court has done is to say district court didn't say this was post hoc. The district court said, I hear you. I reject it. We're not reviewing the district court. We're reviewing the agency. Well, I think that you've got to review what it is that the district court has done. No, we're reviewing the agency. Well, it said the messaging was post hoc. Right. But the rest of it, look, right now, unless this court vacates the district court's assessment of the Nielsen memo, what we have is a district court decision that says that the reasons that you gave are no good. So, even if the secretary then. We're reviewing the secretary. That's just agency law. Okay. We have found there's no deference we give to the district court in a situation like this. We see what the district court said. And we certainly understand it. And it may cause us to think through the case in a certain way. But we are considering de novo the information coming from the agency. That, of course, is entirely correct, Your Honor. The only point that I was trying to make is if you say the district court reviewed the Nielsen memo. And if this court says there should be no review of the Nielsen memo and that that should await a, that that's something that should be determined on the remand, that's a very different decision than the one that the district court rendered. Because the district court addressed the Nielsen memo and said those reasons aren't good enough. People like the best case Alpharma, our decision in Alpharma, which in effect said we'll take these post hoc rationalizations as long as they come from somebody in authority. Yes. And the point is what is, I mean, I totally agree, Your Honor. And the question is what is it that the agency thinks? And we know that if there was an additional remand, we know what Secretary Nielsen will say because she's already said it pursuant to a district court order. Can I ask, one thing I'm kind of struggling with is, and Nielsen is the current Secretary, is expressing her views in the memo, but we have a very weird statutory scheme here where, and you don't have this in the other cases that I've seen, where the ability to determine the law is assigned to the Attorney General. And normally when we see an agency comes up with one explanation and then it's sent back and then they add some others, we have to, and they mix all these reasons together, we have to make a decision about whether, how confident we could be that the agency, if we took away two-thirds or three-fourths of the decision, how confident can we be that the agency would still come to the same conclusion if we took away, for example here, the legal argument? And how can we have that, how do we analyze that, not only just looking at the Nielsen memo, but factoring in the sort of brooding presence of the Attorney General's declaration that the whole darn thing is unconstitutional and will not be defended, and is illegal, and will not be defended anyhow. How can we make that judgment? I think by saying that Secretary Nielsen is entitled to a presumption of regularity, and then when she says she would do it anyway, that's what she means. But if the presumption of regularity would assume that she would accept and take and factor into her decisions what the statute commands, and that is obedience to the Attorney General's judgment about legality. And she said that too. And what she then said, I mean, it's no, look. I guess how could she start from a premise that says I can keep DACA if I wish, but I still don't think I should, when she can't start from that premise? Well, I mean, I don't think, I mean, I understand your point about it being the Attorney General and Secretary, but the argument about reviewability would be the same if it were the Secretary who had just said it in the first instance. I guess it's not the same, because it's harder to apply. We have law on how we, you know, what sort of level of confidence we need to know that the agency would still rest on the independent ground for decision. And I'm just, I haven't seen this in other cases. I'm really just honestly asking how one can analyze that. But the agency has said it. I mean, to say, I mean, it's the fact that you're saying that Secretary Nielsen, I don't believe you. But she couldn't start with the premise that I have a choice to keep DACA. No, but she started, but neither did the FDA. I'm trying to clarify. Do you agree she could not start with the premise that I can keep DACA in place? That's correct. And yet she's made an independent judgment apart from that legal determination that prevents me from having it in place that I wouldn't have it in place. Absolutely. And to say that she can't, I mean, I don't know, you know, when your Honor refers to a level of confidence, you know, like she articulates precisely the kind of argument that was being made sort of like quite apart from judgments about whether you could do prosecution. There was always the argument that, no, this is something that should be done by Congress. It just shouldn't be done. And that's what she's saying. She says it lacks the features of detail and permanence that would be appropriate. And that makes a lot of sense on top of everything. It just doesn't sound terribly disconnected from the legal arguments that started the session. Your Honor, it is, I mean, it's saying like even if I could do it, I still think that my view of what Congress and the executive should be doing in this case, given the ways that DACA has been structured, we need to go, I wouldn't pursue this policy. If we were to disagree with you and say this is reviewable, we're to reach the merits, what's the nature of our inquiry then? What question would we be asking then? I think the only question is, is there a separate ground? And the district court said, projects those and says, well, this really isn't separate. Maybe I didn't ask this right. If we think that there isn't a separate ground, if we think this is all tied up in the secretary's judgment about DACA, we're now going to review the merits. What's the nature of our inquiry? Your Honor, I'm not aware of a court ever having done it. I assume that the question would be whether to determine, to give the secretary an advisory opinion about whether DACA is lawful. Right. And then the secretary would say, thank you very much. And I've already told you that I'm going to wind it down anyway. So it's not like anything that's ever happened. It certainly isn't like OST, which is the only case that, in fact, this court actually did undertake review under Crowley. It's not what Crowley says. It's not what Heckler v. Cheney says. If we end up reviewing it under traditional APA standards under Crowley and OSG, it certainly would require an agency, when it adopts a change in position, to explain reliance interests. And I think we would have to deal with the fact that this, again, at least in my view, this is not just a statement about a position about enforcing or not the law. It is rights were given, rights were taken back. No right was ever given. Authority. Let me rephrase it. Legal authority to work and to establish a life here was given and is now retracted. You were so much on the Fifth Circuit decision, and the Fifth Circuit drew exactly the same distinction I am. They said this isn't just an exercise of discretion. This is a regulatory program. Well, they said what the effect of it was. That's why you had to do notice and comment, they said. Whether we agree or not is a different thing, but they recognize this is not, this isn't, do you have another case that involved enforcement plus regulation? Your Honor, there's never been a case in which someone says that you can't enforce the law, that makes no argument for why you're forcing people. Not that, what you have to do when you change the regulation of people's lives. That's, but those are all, of course, Your Honor, there are legions of cases that say that when an agency promulgates a reviewable regulation, that when it changes that, it has to explain itself. Exactly. But what Crowley recognizes. I'm sorry, I was talking about enforcement. I wasn't clear. Do you have a case that treated as Heckler v. Cheney enforcement discretion, a decision by the executive that said not only am I going, here am I announcing my view of how the law should be enforced, but in doing that, I'm either giving or taking away aspects of your legal status. I'm changing your regulated status in the sense, not just that I'm going to enforce the law against you, but something you had, you will no longer have, that is the ability to work. Be clear, DACA itself, which said there's no reliance interest whatsoever, and it didn't affect the change of the legal status? I think an agency can just declare there's no reliance interest. Yeah, but that really matters. And the terms were for two years and then three years under expanded DACA. There's no question, nobody's saying that there's anybody who is getting less than what was ever authorized, but the secretary is saying is going forward. I'm not doing that anymore. That depends, and that may be stuff we would do more, that's not before us yet on the record, but that is what did the government mean when it said it was two years term. So the two-year term is as long as we get to review in case you don't behave yourself, or was it, which is at least some have argued that's how it was understood in the population. I don't understand how it could be two-year terms giving you a layperson legal status and the authority to work and some other benefits that came with that, and then just yank them back and call that an abortion. That's exactly what it was. Do you have a case where Cheney was applied to a situation where part and partial, and this is how Sessions and Duke described DACA, and the Napolitano memo said the same thing, authorizing work as well as part and partial. It is a consequence of the status. The only thing that there's never been a case in which someone... No, it's about the results. No, Your Honor, obviously saying that we're deferring action then triggers other things, right? That's like a pre-existing scheme. I get that the regulation was there, but they know exactly what they were doing. It's inextricably intertwined. That's why I said this immigration law area seems somewhat different because when you say the magic words, I'm deferring action or not deferring action, and everyone knows that means more than just I'm prosecuting or not. It means I'm prosecuting and you can't do X, Y, and Z, and you lose your ability to do it, or it means I'm not prosecuting and you acquire the ability to do it. Your Honor, nobody suggests that there is a substantive requirement in the statute that the secretary do this. That's not the question. I think it is the question. I mean, this is so far from what we do in the agency area. You don't need that kind of explicit authorization for an agency to engage in permissible regulation. You don't need to say, I have to go find that precise authorization in the statute. You need to find the authority generally. Agencies mostly can't find words that support precisely what they're doing because Congress has enough trouble doing what they're doing now. They'd never get anything done if they had to itemize everything that an agency would then be authorized to do. Your starting point is just so off from what we see day in and day out in the D.C. Circuit. It is not the way it operates. Your Honor, there's never been a case like this in the D.C. Circuit or anywhere else. There's never been a case like this. That's true in any case. That's different from all the rest. I'm talking about agency law. You don't have to have the precise words in the statute for an agency to have the authority to regulate in an area. Supposing, well, let's assume that the view of the law is wrong. What we know is that the Secretary has said that you should do it anyway. And also, just cases like the Crowley has in mind, and the only case where this was ever done was OSG, and then where the government, by the way, didn't even argue that it was a case of enforcement discretion. And there the question was whether a statute really was up or down. Does this statute prohibit something? Here, there's no question that the Secretary has absolute discretion to enforce the law. All you're telling the Secretary is, if you thought that you didn't have this discretion, you were wrong. And that's not something that a court has ever done. I understand that Your Honor thinks that I'm wildly outpaced. Can I go back to my question? I don't recall the answer. Maybe you gave it to me. I didn't recall it. If we decide that we need to reach the merits here, that this is a reviewable decision, again, what's the question we ask? Isn't the question whether DACA is lawful? I think that ultimately, if the court were going to go down that route, it would reach that question, think that there are a hundred reasons why it shouldn't do it. But, yeah, I mean, at the very end of the road. And at that point, are we reviewing the reasoning that was used by the Department of Homeland Security, or are we just reviewing whether its judgment that DACA was lawful is correct or not? I think that the determination would have to be one of, I mean, there, the question really would be, like, I think, sort of, you know, I don't know whether the court would conclude that the secretary gets deference, but assuming the court didn't conclude that, maybe it would be a Chevron analysis. But the point is you'd be looking at the statute, and the upshot of it would be, like, if the court disagreed with the attorney general and the secretary, it would tell that to the secretary, and we know what the secretary would do. And there's no case that's ever, ever been decided that looks anything like that, where you give an advisory opinion to an agency. The Chevron analysis is not an advisory opinion. I mean, it's a very good argument. Of course it should be self-serving, but I want you to know it is self-serving, because you're starting points wrong, in my view. To do a Chevron analysis is not an advisory opinion. It just takes the question, that is, is this permissible under the statute, because the agency, the prior agency, said it was, and someone is challenging it, and we answer the question. That's not an advisory opinion. Absolutely not, Your Honor, but what you're using Chevron in is a regulation that everybody knows can be reviewed. And what BLE and Crowley tell you is just because an agency includes a view of the law in something that is not otherwise reviewable doesn't change the answer. What this feels more like to me is where an agency were to say, we've been implementing this licensing scheme, we're now canceling it, because under Chevron Step 1, the statute compels us to do it. And then a court could say, no, you're wrong about Chevron Step 1, but we're still remanding for you to exercise your discretion. And now the Secretary of Homeland Security would be able to actually make a decision untethered to the Attorney General's decision about reality. Well, I'm familiar with cases, like, obviously, you know, this Court has cases in which agencies issue reviewable determinations. I mean, that's, and I understand, Judge Edwards, that you're not accepting my premise, but if you have a reviewable decision and the agency says, I'm doing Chevron Step 1, and this Court says, no, you have discretion, go back, do your job, that's fine. But that's because it's a reviewable case to begin with. The agency is promulgating regulations. It's not, obviously, I totally agree. Is it just regulations? Well, typically, in a Chevron case, it would likely be regulations. It doesn't have to be. It could be an adjudication. But the point is, you're, like, you know, regulations, adjudications, that's a different world than a, and the question is, is the agency actually, like, the law that's being applied to you, like, is that wrong? Here, you could say the secretary, like, in the end, you know that the secretary has the authority to do that, to do what she's doing. And the only question is, like, how long does it take before a court allows her to do that? Okay, unless my colleagues have further questions. Yeah, it's been very tranquil, so please give me a couple of minutes. Thank you. May it please the Court, Lindy Harrison for the appellees. The government's position is that it can rescind DACA for any reason at all without judicial review, even though rescission will have immediate life-changing consequences for hundreds of thousands of young people, and even though the rationale for rescission is the kind of legal one that courts review in this circuit all the time. That's not correct. Let me turn right to the Nielsen memo and explain why both the new rationales in the Nielsen memo are not properly before the court, and also why, even if they are, why they're both reviewable and also arbitrary and capricious. So, starting with why they're not properly before the court. As Judge Bates agreed, when defending agency action, the agency must defend on the grounds articulated by the agency at the time the agency acted. Now, it's true that the court has the ALFARMA. ALFARMA says just the opposite of that, right? ALFARMA says that when you're on remand, guess what? You're going to get post hoc rationalizations. As long as it's provided by the proper person, and in this case it was, bring it on. So, I think, Aaron, that ALFARMA makes a slightly different distinction, and I think that this is the distinction. ALFARMA was in the context of an agency curing a gap in the record about its existing rationale. New rationales for the agency action weren't really at issue in the ALFARMA case and are, in fact, borrowed by a separate line of cases, starting with Kemp v. Pitts, which are the affidavit cases, and what those cases say- I'm sorry, affidavits are totally different. We remand stuff all the time, and agencies get to, and we're often telling them what to do, but when the agency has the case back in its hands, I don't understand why. What rationale of administrative law would say they can't give us new ideas, too? So, I think it's the same concern that animates the Chenery Doctrine, and that is the notion that the legitimacy of the administrative process depends in part on appearances. But the appearances, we've given it back to them. It's now their baby again, and I don't see that there's any untoward appearance from an agency going, here we go, we're addressing your concerns, court, and we have thought about this more. Here's what we're bringing our agency expertise to bear, and here are our further thoughts. And those cases have discussed Chenery and the Chenery issue, and it's not a Chenery problem. And Chenery is what happens when it's not in front of the agency. Well, so, in our view, you don't want the agency inventing rationales after the fact that appear to be invented for the purposes of litigation. How does this-that sounds almost like a distrust or a motive issue. So, when we remand all the time now, do we always-I'm just not aware of a principle under which when we get a case again after remand, we have to go, you know, look at everything with a skeptical eye. Am I wrong? Well, I don't think it's so much that. I'm a lawyer's talking. That's when we get skeptical.  Right, and I think you asked, you know, where would be the case that articulates the standard about, you know, what was the true rationale? And I think the case is NLRB versus Pitts. And that is-I'm sorry, that's Prill versus NLRB. Prill is a case in which the court said-is reviewing a legal error committed by the agency, and the question is whether the legal error clearly had no bearing on the decision reached. And let's say that the Nielsen memo is fully before the court and that the court can consider all of the rationales in the Nielsen memo. In our view, that's both reviewable and it also continues to be arbitrary and capricious. So, here's why it's reviewable. The government does not make an argument at the second step of the reviewability analysis, right? So, when the court's looking at reviewability, the first question is, is this a presumptively reviewable policy or is it a presumptively unreviewable policy under Heckler versus Chaney? Now, we believe strongly that under Crowley and OSG, this is a presumptively reviewable policy. Then there's a second step where the government can come forward and say, even if it's presumptively reviewable, there's no law to apply here. There's no judicially administrable standard by which we can judge whether this is arbitrary and capricious or not. The government in this case only makes an argument at the first step and argues that Heckler versus Chaney- So, tell me what laws should be applied at the second step. So, the law applied to the second step- Well, so the first law to apply is just- is an analysis of the legality of DACA or the sufficiency of the agency's explanation for why it views it as illegal. And that's because- I'm not so sure why we would engage- I was just thinking for myself why one would engage in the- whether the explanation was sufficient or not. They said it's illegal. The Attorney General said it's illegal. So, I don't know why we wouldn't- the question wouldn't be whether it's illegal or not. It seems a little odd to say, you might be right it's illegal, but you didn't lay out enough reasons for it. If they said it's illegal, then their decision can be upheld or not. If they're right about that illegality, then the fact that they didn't include, you know, a bench memo with it shouldn't make a difference. Should it?  I think the first is because under Chenery, the court is limited to reviewing the rationale given at the time it made its decision. The rationale wasn't illegal. That's true, but it's very unclear from both the Sessions memo, the Duke memo, and frankly, the Nielsen memo, on what theory. They don't need that. United, Vidya, Shea. They don't need to show us their work. They just need to get the answer right or wrong. Well, the question is- And so the question is, if you're going down this line, whether DACA is lawful or not. Not necessarily if they gave the right reasons. Well, if so, under Chenery, I don't think the court really conducted a no vote review. What about United, Vidya? What about Shea? What about those decisions by this court that say, you don't need to show your work, you just need to get the right answer? And so the right answer then is whether DACA is lawful or not, if it is reviewable. Right, if it's reviewable. And I think there's related questions that have to be considered. So one is, even if it's illegal, what did the agency do with that? So the agency has choices. It could, in theory, rescind it, or perhaps, depending on what the rationale was by which the agency viewed the policy as illegal, there are changes the agency could make to the policy. You started out framing it in a way that I thought you were going to answer the question. So look, this is the box the government's trying to put you in. They are essentially arguing, and this is the picture they're trying to paint. Yeah, initially, even though we disagree, may disagree on whether it was initially Chenery or something else. Yeah, initially we said this was not lawful in the first place, and so we're throwing it out. Then the next one, same thing. This was not lawful in the first place, we're throwing it out. Then they finally begin to catch up with how a good attorney might argue the case. And so Nielsen, probably with the advice of someone, here's the box they're trying to put you in. They're essentially saying, okay, I really don't think it's lawful. You know, if you want my view on it, I don't think it's lawful. Only a couple of people before me have said it's not lawful. I'm going to accept your premise that it's lawful, and that the prior administration can do it, and we can do it. Which means that, consistent with prior practice, the agency, I have the authority to decide whether to do it, and I have the authority to decide on what terms. I am now deciding, for the following reasons, that I don't want to do it anymore. So I'm killing DACA. That's the question, it seems to me, you have to answer. And all this fight over the legality. You may have to get to the legality if you can convince us that the second part of her analysis, which is, come on, I'll accept your premise, but I'm going to now exercise my authority, and you say it's lawful, which means I have the authority to have it or not, and I'm getting rid of it for these reasons. Now, how do you come at that? Thank you, Your Honor. I think first is that I think the court can't say that legal error clearly had no bearing on the agency's policy rationales, the sound reasons of enforcement policy that are sort of the third section of the Nielsen memo, and that's because when you look at each of those reasons, each one is infected by the premise articulated by the Attorney General and binding on Secretary Nielsen. Your answer to me suggests that you agree that if we thought that Secretary Nielsen's characterization was accurate, that these were independent and separate reasons, quite apart from her judgment about the legality of DACA, that in fact, that's not reviewable. Oh, no. In our view, it still absolutely is reviewable. How is that? Because when you look at what the rationales actually are, the court has law to apply to those rationales. About congressional inaction? What's the law that you would apply there? Well, that question is, has Congress authorized it or not? Not DACA, but has Congress acted in a way that would allow the agency to implement DACA? No, I don't think that's what the argument is about congressional inaction. I think it's – I understand the argument is, should an agency be acting in this area that is of such interest to Congress, and Congress hasn't acted, is that an appropriate thing for an executive branch agency to do? And that's a policy judgment, right? There's no law that governs that. That's why I think Mr. Stern relied on that argument so heavily. To me, it's the greatest challenge that you have. I understand why you're trying to avoid the Nielsen memo, as I started my questioning with Mr. Stern. If this case were all about the Duke memo, as it was in all the other circuits that have looked at this, I think it's a very, very different case. But I think the burden – and Judge Edwards set it up nicely – the burden you have is to show how do you survive the representation in the Nielsen memo that there are policy reasons, discretionary policy reasons she's relying on, that are independent of her judgment as to the legality – and the Attorney General's judgment – as to the legality of DACA. So how do you answer that? Yeah, and don't – let me just add to that for a minute. Don't take it on whether it's reviewable or not. Be self-serving and say the original policy was a Crowley policy, reviewable. Now in the APA land, when you get rid of that reviewable policy, you have an obligation to explain why. So your obligation, it seems to me, is to tell us why, taking our assumptions, it's arbitrary and capricious for the agency to now say we're gutting that policy and here are the reasons why. Why is that arbitrary and capricious? Assuming that's reviewable. Assuming it's reviewable now, the first reason it's arbitrary and capricious is because there continues to be absolutely no appreciation from the agency of the consequences of rescinding this policy on 700,000 or so young people who are working, who are in school, who are part of teams at jobs, who are planning research that they're planning to travel abroad and conduct and working for years in order to be able to do so on the premise that they have this status and that they have the ability to do that. The first two memos don't say anything at all about that. They're more concerned about the effect on DHS. You're being set up by the government to have to deal with Nielsen if we take their case in the best view. That's right. It seems to me that's what you have to answer. That's right. And even the third memo does not seriously address any of those concerns. There's a nod to them. There's an acknowledgment that people have DACA status, but there's absolutely no consideration of what are the consequences on universities. Can the government say, yeah, we understand. We don't care. That's for Congress to figure that out. Yeah, we understand. It may even be some people may think it's a very serious issue. They're not going to use the words we don't care because it would get press and they would look bad. But they're essentially saying that, as agencies sometimes do, that's not going to be in our value considerations now. That's for someone else to deal with. So I think if the agency were to say essentially we're not going to consider the reliance interest because we don't care about them, that runs right into Encino Motor Cars and the Supreme Court has said you can't do that. When you reverse a prior policy and it will have disruptive effects on the population, you have to seriously consider those effects. They claim they addressed reliance, but that it wasn't an important issue to address because they thought DACA is unlawful. Actually, my question respectfully was a little different than Judge Edwards' question. My question is what do you do with the Nielsen Memo if our judgment is that in fact policy is being identified in the Nielsen Memo? What do we do? What should we do about the fact that the Secretary says that there are policy reasons that are informing her decision separate and apart from the legal decisions? What are we supposed to do with that characterization by the Secretary? So I think first the court should under Prill ask whether the legal error clearly had no effect on those policy reasons. She has said they don't. That's the gravamen of the point. She's saying put DACA to one side and I'm telling you I would have killed it for these policy reasons. Now, we can either disregard that or what do we do with it if we don't disregard it? So if you agree that they're not infected at all by legal error, I think the court still can review them under Crowley. How? Because what Crowley sets up is this dichotomy of is it a single-shot decision not to enforce or is it a general enforcement policy? Now, the rationale for setting up that dichotomy is that most often general enforcement policy will secure legal error. Crowley used that as an example of a single-shot versus general enforcement. I don't think it limited it to that, did it? I think so. If you look at what the court said in OSG, this is at page 812. The court said that an agency's adoption of a general enforcement policy is subject to review. I think that's more than a general enforcement policy, isn't it? It is. The regulatory policy. That's correct. And the court could rule on that grounds as well. That is right. And that's why I think whether you talk about it as a regulatory policy or you talk about it as reliance interests, I think what distinguishes... Those are two very different things. That's right. They are very different things. You can't just say put it in whatever box you want. There are totally different legal consequences to how we characterize what the agency has done here. That's right. But I think the concern animating both is that when you rescind either a regulatory regime or other kind of policy that has immediate life-changing consequences for the population that is targeted by that regime, that that's the kind of thing the APA says ought to be reviewable by the courts. And here, I think what's especially important about the fact that there is this judgment of the Attorney General that DACA is unlawful and unconstitutional, he says, according to the Fifth Circuit, which I don't think even Secretary Nielsen defends. What's important about that is there's this concern animating the APA with public accountability, that the agencies ought to be held accountable for choices that they make that are true policy choices. And anyone reading the Duke memo, the Sessions letter, and the Nielsen memo collectively would not come away with the conclusion that this is just a choice the agency is making completely separate and apart from the Attorney General's judgment that DACA is unlawful and unconstitutional, which means that the agency can point the finger at the courts and say, we're doing this primarily, at least, or in part, because they're going to tell us this is unconstitutional and unlawful, which means they don't have to own this as a policy judgment. Would you agree that there's actually a pretty simple way to rescind DACA, that it can be done fairly straightforwardly? Well, we have constitutional claims that aren't before the court, and so... I shared with Mr. Sturd my frustration at part of the way the case has been argued. Let me share with you another frustration I have. So tell me what's wrong with this narrative, okay? The Obama administration can't get legislative relief for DREAMers, so they resort to DACA, which is not required by the INA, but is arguably permitted by the INA, okay? Then the Trump administration, with a very different view of how to use the discretion Congress gives the executive and the INA, decides to rescind the prior policy. Elections have consequences. Courts shouldn't interfere with policy changes. Why isn't that the narrative that explains what's going on here? Well, as I said, we have... I think that is an approach that they could have taken, but it's, of course, not the one they did take, because they instead chose to point the finger at the courts and at the Fifth Circuit and at a 4-4 Supreme Court affirmance and say that we're doing this because the law binds our hands and ties us in. Now, if they were to come back... That's not what the Nielsen memo says. The Nielsen memo doesn't say that. Well, it says that, and then it also says... Independent, yeah. It also says independently we're doing this because... We would have done it otherwise. We would have done it because Congress... I mean, it's part of your argument that, yeah, we see what's unhelpful to us in Nielsen, but we're asking you to simply disregard it because it's really not honest. It really is not the reason. I don't think the court has to reach that... I mean, I use those words, but isn't that the essence of your argument? How about we can't be confident that the same decision would be made free of legal constraints? I think that that is more consistent with our argument. I don't think the court has to find that faith or has to overcome... Is that your argument, or what is your argument? Well, our argument is essentially that. It is infected by this legal error, and the court can't be sure that it's not because it comes so late in the day and because the rationales that are called policy judgments are so bound up with the legal conclusion. I'm not so sure why late in the day matters. The whole point of a remand is you get a second bite at the apple, so... Well, here's why it matters. If you look in the administrative records, so there's not a new administrative record when Nielsen issues her memo. There's still the old administrative record. What's in that administrative record? The Fifth Circuit's decision, the Supreme Court's 4-4 affirmance, and the OLC memo. There's no policy analysis. There's no analysis of what are the costs of DACA, what will be the economic effects on the country, what will be the national security effects, what will be the effects on law enforcement, who no longer can have this population of people who feel free to come forward and report crimes and live outside of the shadows. There's absolutely nothing in the record to suggest the agency actually looked at those considerations, which I think is why the court could hold that it cannot be sure that that legal error didn't affect the agency's decision. There's no evidence the agency looked at anything other than that. Thank you. Thank you. Mr. Stern, we'll give you back two minutes. Thank you, Your Honor. Just a couple of quick points. One, I think what my friend has made clear is that their view, and I think this was ultimately the view of the district court, is that not only should there be a view of a legal sort of understanding, but there should also be really broader APA review of did you consider all possible factors that might be relevant, and that's one step further away from any case that's ever sort of been in this area. Their point is like this business about... Do you agree or not with how the... Since you've embraced the Fifth Circuit decision so tightly, do you agree or not with their characterization of DACA as a policy that was not just enforcement discretion, it was a regulatory policy, and so not in the headquarter world at all. Do you agree or not agree with that? I mean, that's not... I mean, I haven't looked for that. I mean, what we think is that the Fifth Circuit's concerns in holding expanded DACA as well as DACA on lawful were founded in a view... I'm not talking about their merits decision. I'm talking about their decision, their position on justiciability, on whether this is subject to HEDLAR. They had the same HEDLAR issues. No, the difference there is when you... And this is consistent with one of the cases that says if you don't take action, if there's a danger that you're abdicating your authority, and then the consequences are that... Their justiciability, they did not invoke the abnegated authority. What they invoked was that this was a regulatory policy because of the working I don't know if I would agree with that characterization. So that part of the Fifth Circuit, the Justice Department is not embracing. I can't speak for the department as a whole, but right now, that's not the basis on which I understand this. I have some other questions to clarify. I don't mean to take up your whole time, but the Attorney General said that DACA is not just illegal but unconstitutional. Is that still the position of the Justice Department? I think that what the Attorney General meant by that is simply that this was, in the Attorney General's view, something that the executive branch had aggregated onto itself that should have been... That Congress should do it. So that would be when Nielsen talked about Congress rather than the executive. Right, but what Nielsen says is even if I didn't think it was... I'm sorry, is the fact that it was deemed unconstitutional part of the rationale for not continuing DACA or not? Because all I've heard about after that memo is talking about consistency with the immigration law. So I just want to make sure whether the Justice Department's position is part of its reasons for why DACA is being... They're changing their position on DACA, they're withdrawing and canceling it, is that it's unconstitutional. I think that the constitutional concerns, like in the Attorney General's letter, collapsed that into the statutory analysis because if the statute actually allowed... That's not how the Attorney General framed it. The Attorney General's statement is not very elaborate. So you think that the only thing that makes it unconstitutional is because the statute forbids it? And so that's all that was... I don't think that, I mean, nothing else has ever been identified. We've never made... And your position is that the statute does forbid DACA? Yeah. And that, the Attorney General, that's clearly what the... That is clearly what Secretary Nielsen said. As a matter of separation of powers, this type of exercise of enforcement discretion by the executive is unconstitutional under this statute. I don't know that that in particular was part of the view. I mean, I think that the point is... That's the consequence of what you just said. Well, the consequence, right. I mean, is that the statute doesn't... You don't have the executive branch surrendering this enforcement authority. I mean, what Secretary Nielsen did was to embrace, and what Secretary Jupe did was to embrace the reasoning of the Fifth Circuit in... Not all of it. Not all of it, but the parts that sort of talk about how that sort of, the INA sets out certain categories, and that by doing sort of this kind of categorical thing, that was mistaken. But again... Which doesn't apply to DACA, please. DACA doesn't have that structural problem. No, it does. I mean, what the Fifth Circuit struck down... There isn't a statutory mechanism to deal with parents of citizens in the statute itself. There's no such thing that would address Dreamers. I mean, the Fifth Circuit did hold the extended DACA, which is, in all material respects, no different than this DACA, to be unlawful. So, like, you know, and we think that, you know, in addition to whether there was an absolute concern that this would be illegal, it would certainly be, at a minimum, like, within the Fifth Circuit's decision before fore-affirmance by the Supreme Court for a secretary to go, wow, like, that's a change since, like, the original DACA, like, was adopted. The government's argument is all the deferred enforcement plans from the past before the Obama administration were unconstitutional and unlawful too. This is not the first time this has happened. Excuse me, I'm not sure I follow. It's not the first time there's been a deferred... No, absolutely not. So you're saying all of that's unconstitutional or unlawful under the statute? All of those plans were? The, again, Fifth Circuit distinguished between the kind of deferred action that's been around for a long time and that the Supreme Court has, like, praised, and nobody is suggesting that that's improper. The question is, can you do these kind of categorical decisions? Some of the prior ones were categorical. They're just, as I understand it, people arguing about the nature of the class and the size of the class, but they were categorical. Well, they're typically done on a case-by-case basis. I mean, there's the categorical ones. I mean, the Fifth Circuit decision goes through and it explains why the previous sort of categorical things were different. But, again... And you agree with all that? The Justice Department agrees? Yes. So the Fairness Act. That was never... Deferred voluntary departure. I mean, it was certainly distinguishable and no court ever ruled on it. How was it distinguishable? It was a... That was what the Fifth Circuit described as an interstitial program. No, no, but the Solicitor General told the Supreme Court that it was extra-statutory. It was not interstitial. Yes. No, I mean, look, deferred action... It had voluntary departure, and they said, but we're not going to enforce the voluntary departure. The most deferred action is always... I mean, it's sort of... I think it's the Supreme Court who explained, I think it was an American, that, look, this is a long-standing practice. It's grown up, it's accepted. Nobody's questioning whether that's appropriate. Secretary Nielsen, Secretary Duke, nobody's questioning that. The only question is whether it makes sense for DACA to exist. Like, you can look at it and think, and among the reasons there isn't this effort after the time that DACA and expanded DACA and DACA were adopted, you had a Fifth Circuit decision striking them down, the Supreme Court affirming four to four. That's a significant difference in itself. Certainly a black secretary could take that into account, and the idea that the theme, I think, of my friend, is that there's an infection of all the reasoning that's been given by Secretary Nielsen, and, again, I understand Your Honor's distinction that there was a decision that the Attorney General expressed a binding view, but I think analytically, like, since FDA, you know, Heckler v. Cheney sort of said, you know, the principal reason was we don't think we have authority. They said we're unsure. It didn't say we don't think we have authority. It said we're unsure. Well, I mean, I think that, I mean, I guess I... That's different than I can't... No, I guess I read that differently. I mean, the Supreme Court said, like, they said that, like, what they said was we don't have authority. We're unsure about our authority, but anyhow, we don't want to do it. That's how I read it. I read it more conclusively, that we don't have authority, but it said, I mean, the relevant passage just goes like... Of course, they were the executive agency that had the authority to make that decision. Yeah, I don't think that makes a difference because you would go, look, if I correct their view on authority, maybe they would come to a different decision. I mean, it's the same situation if they were infected by an error, but the Supreme Court didn't go, hmm. So it doesn't make any difference, but in fact, the decision-maker in here had no authority to decide the legal question. I think that the... I think that that's right. I mean, you know, in the same way that it would have been the same if, like, FDA had solicited an OLC opinion and said, OLC said this, but by the way, like, I wouldn't do it anyway. Would the OLC opinion be binding on the FDA? Your Honor... It's not binding here for some reason, so... It wasn't binding on DHS, so... Yeah, so... Okay. Thank you, Your Honor. Thank you very much. The case is submitted. The Court will take a brief recess. Thank you.
judges: Griffith, Millett, Edwards